**In the Matter of CHEYENNE WELLS ELEVATOR CORPORATION, Bankrupt.**

**UNITED STATES of America, Petitioner on Review,**

v.

**James E. WAGNER, Trustee in Bankruptcy, Respondent on Review.**

**No. 40006.**

United States District Court
D. Colorado.

March 10, 1967.

See also D.C., 251 F.Supp. 275.

Lawrence M. Henry, U. S. Atty. for Dist. of Colorado, William E. Gandy, Asst. U. S. Atty., Denver, Colo., Carrie L. Fair, Atty., Dept. of Justice, Washington, D. C., for petitioner on review.

Charles E. Matheson, Denver, Colo., for respondent on review.

### MEMORANDUM OPINION AND ORDER

DOYLE, District Judge.

The United States, on behalf of the Commodity Credit Corporation, seeks review of orders of the Referee in Bankruptcy determining that Commodity Credit Corporation was not entitled to repayment of certain storage charges paid by Commodity Credit Corporation to the bankrupt for the storage of wheat.

The question which has been submitted by the Referee is as follows:

"Did the Referee err, upon the evidence before him and the applicable law, in finding, concluding and ordering that the United States of America, acting in this behalf through Commodity Credit Corporation, is not entitled to repayment of storage charges of $17,099.20 paid by that Corporation for storage of certain wheat not delivered to it?"

In his Order, the Referee determined that to require refund of storage charges to the C.C.C. would constitute a penalty under Section 57j of the Bankruptcy Act if C.C.C. was compensated in full for undelivered wheat. C.C.C. maintains that under the terms of the agreement it is entitled to restitution of these charges regardless of whether it suffered a loss. Essentially then, we are called upon to determine whether this agreement so provides, and if so, whether it is to be treated as a penalty under Section 57j of the Act.

Prior to its adjudication the bankrupt was engaged in the business of storing grain for C.C.C. and others. Its arrangement with C.C.C. was governed by a Uniform Grain Storage Agreement. Pursuant to this, C.C.C. had deposited wheat from time to time and this had been warehoused on a commingled basis with wheat deposited by others. The deposits were evidenced by warehouse receipts issued to C.C.C. and the latter would withdraw wheat by issuing a loading order to the bankrupt and upon receipt of wheat would surrender warehouse receipts for cancellation. The mentioned Uniform Agreement provided, in paragraph 17(d), as follows:

"In the event of any disposition of the grain contrary to the terms of this agreement, no charges shall accrue for any period of time such grain is not in store and no charges of any kind shall be payable on any quantity of the grain not loaded out; Provided, however, That charges shall be payable with respect to such grain if it is determined by CCC that such disposition resulted from normal and prudent warehousing practices, or was

authorized by law, by CCC, or by the lawful holder of the warehouse receipt(s)."

The problem arose in September, 1964, at which time C.C.C. issued loading orders for all the wheat which was then in storage. Bankrupt, however, could not fill the orders and came up short to the extent of 42,000 bushels.

At the time of the bankruptcy the trustee took possession of some 24,000 bushels of wheat which remained in storage and sold this quantity and at present C.C.C. is short 16,800 bushels. The indications are that C.C.C. will be paid in full for the shortage; however, in his Order the Referee provided as follows:

"\* \* \* To the extent, however, that the claim may fail of payment in full after deduction of the amount of the storage charges the deficit then appearing will be considered as storage charges on non-delivered and unpaid-for wheat, and the amount of the deficit, with interest at 6 per cent. per annum from the date or dates of the payment of the storage charges to October 2, 1964, will be additionally allowed."

C.C.C. however, seeks to recover a sum representing storage charges paid to the bankrupt on the 16,800 bushels not delivered. This demand is predicated on Section 17(d) of the agreement.

There is authority in support of C.C.C.'s position: Farmers Elevator Mut. Ins. Co. v. Jorski Mill & El. Co., 259 F. Supp. 755 (W.D.Okl.1966) appeal pending; United States v. Farmers Seed and Feed Co., 181 F.Supp. 475, 476 (M.D.Ga. 1959); United States v. Iowa City Grain & Feed Service, Inc., unreported, S.D. Iowa. However, none of these cases have arisen in bankruptcy proceedings, and so the question before us is the novel one: whether the agreement is entitled to recognition and enforcement notwithstanding the provisions of Section 57j of the Bankruptcy Act. This section provides in part as follows:

"Debts owing to the United States or to any State or any subdivision thereof as a penalty or forfeiture shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose. \* \* \*."

In Simonson v. Granquist, 369 U.S. 38, 82 S.Ct. 537, 7 L.Ed.2d 557 the Supreme Court, in considering tax penalties against a bankrupt's estate, made these comments:

"\* \* [Section 57j] plainly manifests a congressional purpose to bar all claims of any kind against a bankrupt except those based on a 'pecuniary' loss. So understood, this section, which has been a part of the Bankruptcy Act since its enactment in 1898, is in keeping with the broad aim of the Act to provide for the conservation of the estates of insolvents to the end that there may be as equitable a distribution of assets as is consistent with the type of claims involved. \* \* \* *Tax penalties are imposed at least in part as punitive measures against persons who have been guilty of some default or wrong. Enforcement of penalties against the estates of bankrupts, however, would serve not to punish the delinquent taxpayers, but rather their entirely innocent creditors.*" [Emphasis supplied] 369 U.S. at 40–41, 82 S.Ct. at 538.

The act itself defines a penalty somewhat narrowly as an amount not measured by actual loss. Collier on Bankruptcy (3 Collier ¶ 57.22[2]) comments in part as follows:

"The crucial and most litigated problem in connection with § 57j naturally is to determine whether or not a particular debt should be classified as a 'penalty' and therefore disallowed. Judge Learned Hand once defined a penalty as follows: 14 (In re Caponigri (D.C., N.Y.), 27 Am.B.R. 513, 193 F. 291.)

"'In substance an obligation is penal when its amount is measured neither by the obligee's loss, nor by the valuation placed by him upon what he has given in exchange.'

\* \* \* \* \* \*

"Some cases leave little doubt as to the nature of the claim as a criminal sanction. However, notwithstanding the clearly penal character of the obligation and its disallowance on this ground, a reservation may have to be inserted providing for the allowance of actual pecuniary loss suffered by the sovereign, if such loss can be shown."

The Referee has cited Diamond Ice & Storage Co. v. Klock Produce Co., 110 Wash. 683, 189 P. 257 (1920) and Shoreland Freezers, Inc. v. Textile Ice & Fuel Co., 241 S.C. 537, 129 S.E.2d 424 (1963) in support of his holding that the payment of the value of the undelivered grain would be payment in full as to C.C.C. for breach of the storage agreement. These cases hold that when a storage company makes reparation it effectively satisfies the requirements of the storage contract; that it is equivalent to a proper delivery and the warehouseman has a right to retain storage charges. Although neither of these cases was decided with specific reference to paragraph 17(d) which is before us, they do serve as guides to interpretation of Section 57j, supra.

In the case at bar the Government would have us enforce paragraph 17(d) of the contract regardless of pecuniary loss. This may be permissible in an ordinary contract case. Here, however, the Government is prosecuting a bankruptcy claim. To give effect to its contention would result in penalizing the instant creditors involved. The object of Section 57j was to prevent this very thing. It is for this reason that we conclude that we must uphold the ruling of the Referee.

It is so ordered.